IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| MICHAEL A. TATE, | ) | Civil No. 10-440-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

David B. Lowry
9900 S.W. Greenburg Road
Columbia Business Center, Suite 130
Portland, OR 97223

       Attorney for Plaintiff

Dwight Holton, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2904

FINDINGS AND RECOMMENDATION - 1

David F. Morado, Regional Chief Counsel
Willy M. Le, Special Asst. U.S. Attorney
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900, M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

JELDERKS, Magistrate Judge:

Plaintiff Michael Tate brings this action pursuant to 42 U.S.C. § 405 (g)

seeking judicial review of a final decision of the Commissioner of Social Security

(the Commissioner) denying his application for Supplemental Security Income (SSI)

under Title XVI of the Social Security Act (the Act).  Plaintiff seeks an Order reversing the

decision of the Commissioner and remanding the action to the Social Security Administration

(the Agency) for an award of benefits.

For the reasons set out below, the decision of the Commissioner should be affirmed.

**Procedural Background**

Plaintiff filed an application for SSI on September 11, 2007, alleging that he had been

disabled since January 2, 2007, because of depression, hepatitis C, a history of multiple

injuries to his right leg, a history of a gunshot wound in the knee, a history of multiple

stabbings, and a history of a dislocated left shoulder.

After his application was denied initially and upon reconsideration, plaintiff timely

requested a hearing before an Administrative Law Judge (ALJ).  Pursuant to that request,

FINDINGS AND RECOMMENDATION - 2

a hearing was held before ALJ Joel Elliott on August 27, 2009, at which plaintiff;

James Martin, plaintiff's friend; and Richard Keough, a Vocational Expert (VE); testified.

In a decision filed on October 20, 2009, ALJ Elliott found that plaintiff was not

disabled within the meaning of the Social Security Act (the Act). That decision became the

final decision of the Commissioner on March 20, 2010, when the Appeals Council denied

plaintiff's timely request for review. In the present action, plaintiff seeks judicial review of

that decision.


## Factual Background

Plaintiff was born on March 8, 1960, and was 49 years old when the ALJ issued

his decision. He completed 10 years of education, and obtained a GED. He has past work

experience as a general laborer, a warehouse laborer, and a janitor. Plaintiff was incarcerated

in an Oregon State Prison for six years before his release in the fall of 2007.


## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant

is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a

summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094,

1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in

substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the


FINDINGS AND RECOMMENDATION - 3

claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or

FINDINGS AND RECOMMENDATION - 4

by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,

Appendix 2.  If the Commissioner demonstrates that a significant number of jobs exist in the

national economy that the claimant can do, the claimant is not disabled.  If the Commissioner

does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d

at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can

perform jobs that exist in significant numbers in the national economy.  Id.


**Medical Record**

The following is a brief summary of the medical reports generated while plaintiff was

incarcerated and records created during the disability determination process.  To the extent

that it is relevant to the parties' arguments, other medical evidence will be discussed in the

analysis below.

An initial evaluation prepared by the Oregon Department of Corrections dated

May 23, 2003, indicated that plaintiff's diagnoses included Hepatitis C, a history of fracture

of plaintiff's right leg, open reduction internal fixation of a right forearm fracture, cystic acne,

dyslipidemia, and lymphadenosis.  A physical exam disclosed limited range of motion in the

right knee, and complaints of pain in the lower right leg were noted.

Based upon a mental health evaluation performed on March 5, 2004, D. Powell,

MHCM, diagnosed Rule Out Mood Disorder NOS, versus Adjustment Disorder with

Depressed Mood and ASPD.  He noted that plaintiff reported increasing headaches.


FINDINGS AND RECOMMENDATION - 5

In his notes of a visit on May 13, 2005, Dr. Duncan noted that plaintiff was following his "self-directed" exercise program and taking Indocin for pain. Dr. Duncan noted that plaintiff had an open Workers' Comp claim related to an injury to his right leg. Chart notes dated August 26, 2005, indicate that plaintiff walked with a limp. Plaintiff was seen for leg pain on December 13, 2005, after he had been transferred to a minimum security facility. A work restriction was imposed allowing plaintiff to work only indoors because of the effects of cold on his right leg. A chart note dated February 15, 2006, indicated that plaintiff reported continued difficulty with cold outside air. Dr. Graham told plaintiff that Naprosyn would have to suffice for the pain, that he needed to "toughen up and deal with it," and that moving to a warmer climate probably would "make a huge difference."

A liver biopsy performed on October, 2006, showed chronic hepatitis, grade 1-2 inflammatory and stage 1 fibrous Chronic Hepatitis.

In a visit to Dr. Graham on May 31, 2006, plaintiff complained of headaches and pain in his leg caused by his assigned work clearing brush in hilly terrain. Dr. Graham noted that plaintiff had a history of a "pretty severe industrial accident causing multiple problems," but noted that he had no way to "objectively document" plaintiff's complaints. He noted that plaintiff would probably benefit "from some sort of work where he is not on uneven ground up and down hills and can have a little bit of break on occasion . . . ."

In a progress note dated December 8, 2006, Ms. Harmon, PMHNP, noted that plaintiff was trying to decide whether to start taking medication for depression before being released. On March 27, 2007, PMHNP Sauer listed plaintiff's diagnoses as Major Depressive Disorder; seasonal cycling; provisional. Celxa was prescribed, and Vistaril was

FINDINGS AND RECOMMENDATION - 6

later added for insomnia that plaintiff reported.  Dr. M. McCarthy, a psychiatrist, increased

the dosages of those medications on July 9, 2007, and confirmed the diagnosis of Major

Depressive Disorder.  He noted that plaintiff was grieving the death of his wife in October,

2005, and that plaintiff's first wife had also died.  Dr. McCarthy added Amitriptyline to

plaintiff's medications on August 20, 2005.  He also noted that plaintiff complained of low

energy, was deconditioned, and had poor sleep hygiene.  Dr. McCarthy discontinued

Amitriptyline on September 19, 2007, and plaintiff was provided with Caffergot for

headaches, as well as TCN and Lactulose, before being released on parole on September 22,

2007.

        On February 16, 2008, Dr. Jason Aldred performed a consultative physical

examination.  Plaintiff reported that his right leg had been mangled by a conveyor belt in an

industrial accident in 2002, and that this had exacerbated the pain he experienced in that leg

related to a gunshot wound he suffered in 1988.  Plaintiff reported that his right shoulder was

"dislocated and mangled" when he was hit by a bus in 1996.  Plaintiff reported that he had

been shot "a total of three times, mostly in the leg and hand, and stabbed four times in both

hands."  The stabbings had impaired the function in his right hand.  Plaintiff reported that he

had been thrown through the windshield of a car during an accident in 1995, and that he had

fractured his right arm in a fall in 2002.  He added that he had a metal plate in his arm, which

ached with cold weather and prolonged use.

        Dr. Aldred listed plaintiff's medications as Divalproex, Lisinopril, Tramadol, and

Trazadone.  He noted that plaintiff's gait was antalgic with a right-sided limp, and reported

swelling and a palpable non-tender spur on the anterior of the right lower leg.  Dr. Aldred

FINDINGS AND RECOMMENDATION - 7

diagnosed left shoulder dislocation; degenerative joint disease of the back, wrist, left

shoulder, and right arm; and Dupuytren's contracture of the left little finger.  He indicated

that plaintiff's medical history included multiple traumas and depression.

Dr. Aldred opined that plaintiff could be expected to stand and walk without

limitations during an eight-hour work day, and that he would be able to sit without

limitations.  He opined that plaintiff could lift or carry 50 pounds frequently and 100

occasionally, and could lift/carry 25 pounds frequently and 50 pounds occasionally with

limitation in grip and release in his left hand.  Dr. Aldred imposed no postural limitations on

bending, stooping, and crouching, and opined that plaintiff had "no manipulative limitations

or relevant visual, communicative, or workplace environmental limitations."

Dr. Martin Kehrli, a non-examining Agency consultant, completed a Physical

Residual Functional Capacity (RFC) Assessment form dated March 4, 2008.  Dr. Kehrli

opined that plaintiff could occasionally lift/carry 20 pounds, and could frequently lift/carry

10 pounds; could stand/walk/sit for up to 6 hours each during an 8-hour work day; was not

limited in his ability to push/pull, except as to the weight limits noted above; could

occasionally climb ramps/stairs/ladders/ropes, and scaffolds; could occasionally stoop, kneel,

crouch, crawl; and could frequently balance.  He opined that plaintiff could perform light

exertional level work.

Paul Rethinger, PhD, a non-examining Agency consultant, completed a Psychiatric

Review Technique form dated March 4, 2008.  Dr. Rethinger opined that plaintiff had a

major depressive disorder, and indicated that there was insufficient evidence upon which to

assess functional limitations related to his mental condition.  He reported that plaintiff had

FINDINGS AND RECOMMENDATION - 8

failed to confirm his first appointment for a "PDI," and that "he did not show for [a] second appointment."  Dr. Rethinger stated that a PDI was needed to assess plaintiff's current mental status.  He added that "[s]ince clmt has not cooperated with PDI, claim denied for failure to cooperate."

At the request of the Agency, Gary Sachs, PhD, a clinical psychologist, performed a consultative psychological examination on July 9, 2008.  Dr. Sachs noted that his examination was brief, that he was asked to address depression and plaintiff's history of drug abuse, and that his results were based primarily on information obtained from plaintiff, and that the "conclusions must be considered in that light."  The evaluation included a diagnostic interview, a mental status examination, and a review of the records provided by the Agency.

Plaintiff told Dr. Sachs that he had used alcohol and cocaine "daily" since his release from prison the previous year, and that he paid for the cocaine by "hustling."  He said that he had left school when he "went to prison" at the age of 17 for Robbery II and Burglary II, and that he had been incarcerated for a total of 15 years during his adult life.  Plaintiff told Dr. Sachs that the longest he had kept a job was 5 months, that he had last worked at the Portland Recycling Center for one week in 2000, and that the job ended when he broke his leg.

Dr. Sachs diagnosed Polysubstance Dependence, Substance-induced Depression, and Antisocial Personality Disorder, and assigned a GAF score of 45.[1]  He opined that, because of

---

[1]A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders, (DSM IV)*, American Psychiatric Association, 4th Edition (1994) p. 32.

his use of alcohol and drugs, plaintiff "does not appear capable of handling benefit funds independently, if granted . . . ."

Robert Henry, PhD, a consulting Agency non-examining psychologist, completed a Mental Residual Functional Capacity Assessment dated July 18, 2008. Dr. Henry opined that plaintiff was moderately limited in his ability to interact appropriately with the general public and in his ability to be aware of normal hazards and to take appropriate precautions, and was otherwise not significantly limited. He also opined that plaintiff should not interact with the general public, but could ask for assistance or accept instructions, and should avoid all hazards because of "DAA." Dr. Henry indicated that an RFC assessment was needed, based upon plaintiff's personality disorders and substance addiction disorders.

Dr. Henry also completed a Psychiatric Review Technique of the same date. He found that plaintiff had no restriction of activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. Dr. Henry indicated that plaintiff used alcohol and cocaine daily, listed plaintiff's diagnoses as including polysubstance abuse, substance induced depression, antisocial personality d/o, and assessed plaintiff's Global Assessment of Functioning score as 45. He opined that, because of his drug and alcohol use and psychological symptoms, plaintiff should be restricted to minimal public contact and minimal contact with hazards.

Dr. Valerie Krause, a Family Physician at the Multnomah County Mental Health Department, began treating plaintiff on May 19, 2008. In a letter "to whom it may concern" dated July 28, 2008, Dr. Krause opined that plaintiff

FINDINGS AND RECOMMENDATION - 10

suffers from many disabling medical conditions including bipolar disorder, hepatitis C and degenerative and post-traumatic arthritis.  He does not have medical insurance and cannot afford proper specialty treatment such as biopsy and medications for his Hepatitis C.  Due to his medical problems, he is unable to work.  His disabilities are permanent and not likely to improve.

At the request of plaintiff's counsel, on May 1, 2009, Dr. Krause completed a mental health source statement form regarding plaintiff.  Dr. Krause indicated that she had seen plaintiff at least monthly since May, 2008.  She diagnosed bipolar disorder and a history of "multiple head injuries with resultant brain disease," and rated plaintiff's GAF at 70.  Dr. Krause endorsed a very long list of symptoms, and opined that plaintiff:

-Would experience substantial difficulty with stamina, pain, or fatigue working 8 hours a day, 5 days a week at light or sedentary levels;

-Would require a reduced work pace if working full-time at light or sedentary levels;

-Had a "very poor" ability to work 8 hours a day, 40 hours a week, maintaining a normal work pace;

-Would likely experience greater musculoskeletal pains if he performed full time work at light or sedentary levels;

-Would likely have substantial difficulty "getting along appropriately with members of the public" encountered on the job;

-Would likely have substantial difficulty "getting along with supervisors or co-workers" encountered on the job; and

-Would likely miss work more than four days per month because of his impairments.

Dr. Krause opined that plaintiff was extremely limited in his ability to:

-remember work-like procedures;

-maintain attention for two-hour periods;

-maintain regular attendance and be punctual;

-work with others without being unduly distracted;

FINDINGS AND RECOMMENDATION - 11

-make simple work-related decisions;

-complete a normal workday and workweek without interruptions from psychologically based symptoms;

-perform at a consistent pace without an unreasonable number and length of rest periods;

-accept instructions and respond appropriately to criticism from supervisors;

-get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;

-respond appropriately to changes in a routine work setting;

-deal with normal work stress; and

-be aware of hazards and take appropriate precautions.

Dr. Krause opined that plaintiff was markedly limited in his ability to understand, remember, and carry out short, simple instructions, and to ask simple questions or ask for assistance.  She opined that, because of his mental impairments, plaintiff had the following functional limitations:

-Moderate restriction of activities of daily living;

-Marked difficulties in maintaining social functioning;

-Constant deficiencies of concentration, persistence or pace; and

-Continual episodes of decompensation.

In a second "to whom it may concern" letter dated July 25, 2009, Dr. Krause reiterated her conclusion that, because of his medical problems, plaintiff was "unable to work."  She again opined that plaintiff's disabilities were "permanent and not likely to improve."

**ALJ's Decision**

At the first step of his disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity since the date of his application.

At the second step, the ALJ found that plaintiff had the following severe impairments: a mood disorder, a personality disorder, substance addiction disorder, degenerative joint disease, and a history of fractures. Plaintiff does not dispute this finding.

At the third step of his analysis, the ALJ found that none of plaintiff's impairments met or medically equaled an impairment in the "listings," 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). This finding is not disputed.

The ALJ next evaluated the effect of plaintiff's medical impairments on his ability to work. <u>See</u> 20 C.F.R. § 416.920(d). In his assessment of plaintiff's residual functional capacity (RFC), the ALJ found that plaintiff:

> Has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to slow, deliberate walking on even surfaces. He should be allowed the use of a cane as needed. He can do no overhead work. He is limited to simple, non-complex work with minimal public interaction.

As part of his determination of plaintiff's RFC, the ALJ evaluated plaintiff's credibility. He found that plaintiff's allegations concerning the severity of his symptoms and limitations were not entirely credible because the medical evidence was inconsistent with his alleged limitations, and his activities of daily living contradicted his testimony. Plaintiff has not challenged this conclusion.

At the fourth step of his disability analysis, the ALJ found that plaintiff could not perform his past relevant work as a general laborer, a warehouse laborer, or a janitor.

FINDINGS AND RECOMMENDATION - 13

At the fifth step, based upon the testimony of the VE, the ALJ found that plaintiff could work as an electronics assembler, a small products assembler, and a hand packer, and that these positions existed in substantial numbers in the national economy. Based upon this conclusion, he found that plaintiff was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

FINDINGS AND RECOMMENDATION - 14

**Discussion**

Plaintiff contends that the ALJ failed to provide sufficient support for his rejection of Dr. Krause's opinions, erred in rejecting testimony from lay witnesses, and failed to establish that the jobs cited by the VE existed in substantial numbers within the meaning of the Act.

1. **Rejection of Dr. Krause's opinion**

A. Applicable Standards

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761-62 (9th Cir. 1989). Accordingly, an ALJ must support the rejection of a treating physician's opinion with "findings setting forth specific and legitimate reasons for doing so that are based on substantial evidence in the record." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions. Lester v. Chater, 81 F.2d 821, 830-31 (9th Cir. 1995). An ALJ must provide "specific and legitimate reasons," which are supported by substantial evidence in the record, for rejecting an opinion of a treating physician which is contradicted by the opinions of other doctors. Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (citing Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998)).

An ALJ need not accept a doctor's medical opinion that "is brief, conclusory, and inadequately supported by clinical findings." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)). In addition, if an ALJ properly discounts a claimant's credibility, he may reject a treating

physician's opinions that are based upon the claimant's self-reports.  See Rommasetti v.

Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).


B. **Analysis**

As noted above, Dr. Krause, one of plaintiff's treating physicians, opined that plaintiff

suffered from an extraordinary number of severe impairments, was severely limited by

physical problems, was markedly to constantly impaired in a number of areas because of

mental problems, and would likely miss work more than four times a month because of his

impairments.  Because these opinions were contradicted by other medical experts, the ALJ

was required to provide "specific and legitimate reasons," which were supported by

substantial evidence in the record, for their rejection.

The ALJ gave "little weight" to Dr. Krause's opinion on the grounds that it was

"not consistent with the treatment record," was inconsistent with the GAF rating of 70

that Dr. Krause assigned, and was inconsistent with Dr. Krause's records reflecting "no

examination findings other than weight and blood pressure."  The ALJ also asserted that

Dr. Krause's "minimal findings" were "not sufficient to support the debilitating limitations

she describes."

Plaintiff contends that these were not "specific and legitimate reasons," supported by

"substantial evidence" in the record, and that they therefore failed to provide the necessary

foundation for rejection of a treating physician's contradicted opinion.  I disagree.  As the

Commissioner correctly notes, an ALJ may reject a doctor's opinion if it is not consistent

with her medical findings.  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008).

Dr. Krause's record concerning plaintiff's physical condition did not include findings that

FINDINGS AND RECOMMENDATION - 16

supported the extreme limitations set out in her opinion, and a GAF score of 70 is

inconsistent with the constant and marked impairments that Dr. Krause attributed to

plaintiff's mental condition.  Plaintiff correctly observes that Dr. Krause indicated that his

GAF score had varied from 50 to 70 during the previous year, and notes that a GAF score

reflects only plaintiff's mental condition.  However, even a GAF score of 50, which indicates

borderline serious to moderate symptoms, is inconsistent with the extreme limitations to

which Dr. Krause opined.  See *DSM IV-TR* at 34.  In addition, Dr. Krause's endorsement of

extreme limitations at the same time she rated plaintiff's GAF at 70 is simply inconsistent.

Except where it specifically sought information as to a different time period, the form she

completed asked for Dr. Krause's opinion as to plaintiff's limitations at the time she

completed the evaluation.  Dr. Krause's assignment of a GAF score of 70 is wholly

inconsistent with the bulk of her opinions concerning plaintiff's functional capacity, and

the ALJ's citation to this inconsistency provided the kind of specific and legitimate basis,

supported by substantial evidence in the medical record, that is required to discount the

contradicted opinion of a treating physician.

The ALJ asserted that Dr. Krause's treatment records included no examination

findings other than plaintiff's weight and blood pressure.  A review of Dr. Krause's records

supports this conclusion.  Dr. Krause's records largely reflect discussions of plaintiff's

medications, and do not include references to the "signs and symptoms" endorsed in her

completed questionnaire.  The ALJ's conclusion that Dr. Krause's "minimal findings" were

insufficient to support the "debilitating limitations" she described is supported by the record,

including the larger medical record which is devoid of the evidence of extreme limitations to which she opined.

The ALJ provided sufficient reasons for rejecting Dr. Krause's opinion.

2. **Lay Witness Statements**

The record includes lay witness statements from Gregory Brown, Lucy Tate, and hearing testimony of James Martin.  Brown stated that plaintiff had memory problems and difficulty focusing, had a hard time sitting or standing for more than 30 minutes at a time, and fell at times.  Tate, plaintiff's sister, reported that plaintiff does not get along with people, forgets things, has poor concentration, has problems sitting or standing for any length of time, and falls at times because his leg gives out.

Martin, a friend of plaintiff, testified that plaintiff can walk only 1 ½ blocks, has trouble using his arms and hands, drops thing, is in constant pain, easily fatigued, and irritable.

The ALJ found that the statements of Brown and Tate were "not entirely credible in light of the treatment record."  He noted that Dr. Aldred, an examining physician, had found "no limitations in standing, walking or sitting," and concluded that, though plaintiff "may have some difficulty getting along with people, there is no evidence of difficulties with routine types of social interactions."  He added that "[a]n evaluating psychologist found adequate concentration on mental status examination . . . ."

The ALJ likewise found that Martin's testimony was not "entirely credible in light of the medical evidence of record."  He asserted that an evaluating physician had "found no

limitations in walking and no manipulative limitations," and observed that there was "no evidence of difficulty with routine social interactions."

Plaintiff contends that the ALJ failed to provide sufficient reasons for discounting the credibility of the lay witness statements and testimony. I disagree. An ALJ is required to consider lay witness testimony concerning a claimant's ability to perform activities required for employment, e.g., Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006), and must provide "germane" reasons for rejecting any lay witness testimony that is not fully credited. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

Inconsistency with medical evidence is a "germane" reason for discrediting lay witness evidence. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). Here, the ALJ cited the disparity between the lay witness testimony and the objective findings of Dr. Aldred, an examining doctor. The ALJ correctly noted that Dr. Aldred opined that plaintiff had no sitting, standing, or walking limitations that related to his ability to work, and found that plaintiff's ability to grasp was "completely intact," and that he had "manipulative limitations" in spite of his injuries. Though plaintiff asserts that Dr. Aldred's conclusions were not supported, in determining whether the ALJ sufficiently supported his decision to not fully credit the statements of lay witnesses, the question is not the correctness of Dr. Aldred's opinions, but whether those opinions were germane. They were. As to the lay witness testimony concerning plaintiff's ability to get along with others, the ALJ recognized that plaintiff "may have some difficulty getting along with people," and accommodated any social limitations supported by the record by imposing a limitation to "minimal public interaction" in his vocational hypothetical.

The ALJ adequately supported his assessment of the evidence from lay witnesses.

3. **Adequacy of ALJ's RFC Assessment**

In his RFC assessment, the ALJ found that plaintiff

> [h]as the residual functional capacity to perform a full range of work at all
> exertional levels but with the following nonexertional limitations: he is
> limited to slow, deliberate walking on even surfaces.  He should be allowed
> the use of a cane as needed.  He can do no overhead work.  He is limited to
> simple, non-complex work with minimal public interaction.

Plaintiff contends that this RFC assessment fails to account for all of his impairments

and limitations.  He contends that the ALJ erred in failing to incorporate all of his

impairments, including those that were not "severe," such as sleep difficulties, headaches,

incontinence, and a personality disorder.  Plaintiff further asserts that the ALJ failed to

address "all medical opinions," improperly rejected a left arm lifting limitation to 50 pounds

found by Dr. Aldred, improperly rejected a non-examining physician's limitation to light

work, failed to address the side effects of plaintiff's medications, did not address the stress

involved in production work, and failed to include any limitation accounting for the

"moderate" limitations in concentration, persistence, or pace that he found.  He contends that

the limitation to "simple, noncomplex work" that the ALJ imposed did not account for his

impaired concentration, persistence, and pace.

These contentions fail.  As to those alleged impairments that the ALJ did not find to

be "severe," it is notable that subjective statements alone are insufficient to establish

impairment or limitations.  42 U.S.C. § 1382c(a)(3)(H); 20 C.F.R. § 416.928(a).  The ALJ

concluded that there was little or no evidence to support plaintiff's allegations concerning

impairments that the ALJ did not find to be severe.  He further concluded that plaintiff was

not wholly credible, and plaintiff has not challenged that conclusion here.  The ALJ's

conclusion that plaintiff could work at any exertional level was supported by the opinion of

FINDINGS AND RECOMMENDATION - 20

an examining doctor, who opined that plaintiff could occasionally lift 100 pounds.  The

Commissioner correctly notes that, unlike the consulting medical experts who reviewed the

record and concluded that plaintiff was limited to light level work, Dr. Aldred "actually

examined Plaintiff and observed his lifting ability," and that an examining doctor's opinion

carries more weight than the opinion of a reviewing doctor.  See Holohan v. Massanari,

246 F.3d 1195, 1201-02 (9th Cir. 2001).  The Commissioner also correctly observes that the

existence of  impairments related to the side effects of medications is supported only by

plaintiff's testimony and by Dr. Krause's opinion, both of which the ALJ properly

discredited.

Turning to the adequacy of the ALJ's limitation to "simple, non-complex work,"

I note that the Ninth Circuit Court of Appeals has observed that "an ALJ's assessment of a

claimant adequately captures restrictions related to concentration, persistence, or pace where

the assessment is consistent with restrictions identified in the medical testimony."

Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173 (9th Cir. 2008) (citing Howard v.

Massanari, 255 F.3d 577, 582 (8th Cir. 2001); Smith v. Halter, 307 F.3d 377, 379 (6th Cir.

2001)).  In Stubbs-Danielson, the court concluded that a limitation to "simple, routine,

repetitive sedentary work, requiring no interaction with the public" sufficiently accounted for

moderate limitations in a claimant's ability to perform at a consistent pace.  Id. at 1173-74.

The court reached this conclusion even though the VE had testified that "anything more than

a mild limitation with respect to pace would be precluded from employment except in a

sheltered workshop . . . ."  Id.  The court noted that the ALJ had rejected the VE's testimony

because it did not address the claimant's RFC "and did not appear to be based on her

individual record as a whole," and indicated that it would not disturb the ALJ's determination "where, as here, the evidence reasonably supports the ALJ's decision."  Id. at 1174.

Here, as in Stubbs-Danielson, the adequacy of the limitations imposed by the ALJ turns on whether his assessment is "consistent with the restrictions identified" in the medical record.   Based upon my review of the medical record, I conclude that the ALJ's assessment, as set out in his RFC analysis and vocational hypothetical, is consistent with the medical evidence.  The medical evidence supported the conclusion that plaintiff had no significant cognitive difficulties, and had sufficient ability to concentrate and maintain the persistence and pace to perform "simple, non-complex" work activity.


4. **Adequacy of the ALJ's Vocational Hypothetical**

In order to be accurate, an ALJ's hypothetical to a VE must set out all of the claimant's impairments.  Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The ALJ's depiction of the claimant's limitations set out in the hypothetical must be "accurate, detailed, and supported by the medical record."  Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999). If the assumptions included in the hypothetical are not supported by the record, a VE's opinion that a claimant can work lacks evidentiary value.  Gallant, 753 F.2d at 1456.

Plaintiff contends that the ALJ's conclusion that he could perform the jobs identified at step five was not supported by substantial evidence because the ALJ's RFC assessment and vocational hypothetical posed to the VE did not include all of his "limitations and restrictions."  I disagree.  For the reasons set out in the discussion above, I conclude that the RFC and vocational hypothetical were based upon substantial evidence in the record and did

FINDINGS AND RECOMMENDATION - 22

not reflect legal error.  The ALJ met the burden of establishing, at step five, that plaintiff could perform "other" jobs that existed in substantial numbers in the national economy.

5. __ALJ's Reliance on VE's Testimony Concerning Numbers of Jobs in the National Economy__

Plaintiff contends that the ALJ also failed to meet his burden of establishing at step five because he ignored evidence from governmental agencies showing that there is no information as to the number of positions in any particular job title listed in the Dictionary of Occupational Titles (DOT), and that he failed to "discuss such evidence and explain why he chose to reject it in favor of the unsubstantiated testimony of the VE."

These contentions fail.  The Ninth Circuit Court of Appeals has held that an ALJ may take administrative notice of any reliable information concerning the number of relevant jobs that exist in the national economy, including information provided by a VE.  Bayliss, 427 F.3d at 1218 (citing Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995)).  The "necessary foundation" for a VE's testimony is provided by a VE's "recognized expertise. . . ."  Id. Accordingly, the ALJ here was entitled to rely on the VE's testimony concerning the numbers of particular jobs that exist in the national economy.

## Conclusion

A judgment should be entered affirming the decision of the Commissioner and dismissing this action with prejudice.

FINDINGS AND RECOMMENDATION - 23

**<u>Scheduling Order</u>**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due August 12, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 26th day July, 2011.


/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge